2002 UT 62

**Mark BAKOWSKI, Plaintiff,**

v.

**MOUNTAIN STATES STEEL, INC., Defendant, Third–Party Plaintiff, Appellant, and Cross–Appellee,**

v.

**Voest–Alpine Services & Technologies Corp., Third–Party Defendant, Appellee, and Cross–Appellant.**

No. 20000608.

Supreme Court of Utah.

July 9, 2002.

Mark Bakowski, pro se.

Donald L. Dalton, Salt Lake City, for Mountain States.

Terry M. Plant, H. Justin Hitt, Jason M. Kerr, Salt Lake City, for Voest–Alpine.

RUSSON, Justice.

¶ 1 Third-party plaintiff Mountain States Steel, Inc. ("Mountain States"), appeals from an order granting summary judgment to third-party defendant Voest–Alpine Services & Technologies Corporation ("Voest–Alpine"). Voest–Alpine cross-appeals the denial of its first motion for summary judgment and the trial court's refusal to award Voest–Alpine additional attorney fees. We affirm.

## BACKGROUND

¶ 2 On January 19, 1994, Voest–Alpine entered into an agreement to lease a commercial building from Mountain States, said lease to commence on March 1, 1994, and to terminate twelve months later unless terminated sooner or extended pursuant to any provision of the lease agreement. The lease agreement obligated Mountain States to complete by March 1, 1994, fifteen designated improvements essential to Voest–Alpine's tenancy. Further, the lease agreement required Voest–Alpine to obtain and keep in force during the term of the lease an insurance policy insuring both Mountain States and Voest–Alpine against any liability arising out of the ownership, use, or occupancy of the leased building.

¶ 3 The agreement provided that if Mountain States failed to complete the improvements to the premises on time as agreed, Voest–Alpine had the option to perform the work itself or to assist in order to keep the Mountain States improvements on time, and if Mountain States could not deliver the premises on March 1, 1994, Voest–Alpine

would not be obligated to pay rent until the premises were delivered.

¶ 4 The agreement also provided that if Voest–Alpine failed to procure and maintain the required insurance, Mountain States had the option to procure and maintain such insurance at the expense of Voest–Alpine or, in the alternative, to declare Voest–Alpine's failure to procure insurance a material breach of the lease.

¶ 5 In a subparagraph entitled "Waiver of Subrogation," the lease agreement provided that Mountain States and Voest–Alpine waived any and all rights of recovery against each other for loss or damage where such loss or damage was insured against "under any insurance policy in force at the time of such loss or damage." It further provided that upon obtaining the required policy of insurance, notice would be given to the insurance carrier of the "waiver of subrogation" and endorsements to the policy recognizing the same would be procured.

¶ 6 March 1, 1994, came and went, and Mountain States had not completed the required improvements, thus precluding Voest–Alpine from taking possession of the leased property at that time, and Voest–Alpine had not procured the required insurance. Voest–Alpine finally took possession of the premises on April 6, 1994.

¶ 7 Meanwhile, on March 4, 1994, an accident on the subject premises seriously injured two of Voest–Alpine's employees, Mark Bakowski ("Bakowski") and Alfonse Ramirez ("Ramirez"), resulting in liability claims against Mountain States. Voest–Alpine had directed those employees to assist Mountain States in completing the required improvements on the lease premises for Voest–Alpine's occupancy. The accident occurred while Bakowski and Ramirez were working in a "man-basket" suspended by a cable about forty feet above a concrete floor. The cable snapped, and the men plummeted to the floor, sustaining severe and permanently disabling injuries.

¶ 8 Bakowski and Ramirez made claims against Mountain States. Mountain States tendered the defense of these claims to Voest–Alpine under the lease agreement that obligated Voest–Alpine to provide insurance for Mountain States. Voest–Alpine refused to defend Mountain States, denying any liability and any obligation to indemnify Mountain States.

¶ 9 Mountain States, through its own insurers, settled with Ramirez for $1,182,500 in exchange for a release of any claims Ramirez could assert against Mountain States arising from the accident. However, Bakowski filed this action against Mountain States to recover for his injuries resulting from the man-basket incident. Mountain States answered the complaint and filed a third-party action against Voest–Alpine, alleging breach of contract and indemnification because of its failure to procure insurance protecting Mountain States against such claims as agreed in the lease agreement. After mediating Bakowski's claims, Mountain States, through its own insurers, settled with Bakowski for $503,714, but Mountain States' third-party claim against Voest–Alpine remained pending before the trial court.[1]

¶ 10 Initially, both Mountain States and Voest–Alpine moved for summary judgment. The trial court granted Mountain States' summary judgment motion and denied Voest–Alpine's summary judgment motion, concluding that the lease commenced on March 1, 1994, and that any duties under the lease to procure insurance commenced on that date. Subsequently, both parties again moved for summary judgment. On these motions, the trial court granted summary judgment to Voest–Alpine, concluding that the "waiver of subrogation" provision contained in the lease agreement barred Mountain States' claims.

¶ 11 Subsequently, pursuant to a provision in the lease agreement, Voest–Alpine moved for attorney fees as the prevailing party. Voest–Alpine sought an award of $30,206.45 for fees paid to its Salt Lake attorneys and $23,637.50 paid to its Pittsburgh, Pennsylvania, attorneys. The trial court granted Voest–Alpine's motion for attorney fees in part, concluding that only $30,206.45 was rea-

1. Mountain States' own insurers, having settled and paid Bakowski and Ramirez, pursue this matter under their subrogation rights in Mountain States' name.

sonable, and ordered Voest–Alpine's counsel to prepare a proposed judgment awarding the fees. Preparing the proposed judgment, counsel discovered that Voest–Alpine actually paid $38,380 to its Salt Lake counsel, and because of an arithmetic error, Voest–Alpine undervalued the attorney fees it claimed. Thereupon, counsel prepared both a proposed findings of fact and conclusions of law and a proposed judgment that awarded Voest–Alpine $38,380. The trial court signed the proposed award but crossed out the increased amount and replaced it with the original amount of $30,206.45, consistent with its previous determinations.

¶ 12 Mountain States appeals, contending that the trial court erred in granting Voest–Alpine summary judgment because the waiver of subrogation provision contained in the lease agreement did not bar Mountain States' claim. Specifically, Mountain States contends that the waiver of subrogation provision is conditional, applying in this case only if Mountain States' insurers were notified that the lease contained the waiver of subrogation provision and recognized it in an endorsement to Mountain States' policy, and Mountain States contends that the waiver is inapplicable because these required conditions were unsatisfied.

¶ 13 Voest–Alpine cross-appeals, asserting that the trial court erred in denying its first motion for summary judgment by concluding that the lease term commenced on March 1, 1994, instead of April 6, 1994, when Voest–Alpine took possession of the leased premises. Specifically, Voest–Alpine contends that because the lease did not actually commence until Voest–Alpine took possession on April 6, 1994, it was not required to procure insurance until that date, and Voest–Alpine is therefore not contractually liable to Mountain States for the settlement amounts Mountain States paid to Bakowski and Ramirez. Additionally, Voest–Alpine argues that the trial court abused its discretion in reducing the attorney fee award contained in the proposed judgment when the proposed judgment was supported by an affidavit.

## STANDARD OF REVIEW

■ ¶ 14 Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c); *see also Ault v. Holden*, 2002 UT 33, ¶ 15, 44 P.3d 781. Whether the trial court properly granted summary judgment is a question of law that we review for correctness, according no deference to the trial court's legal conclusions. *Holmes Dev., LLC v. Cook*, 2002 UT 38, ¶ 21, 48 P.3d 895. In making that determination, " 'we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.' " *Ault*, 2002 UT 33 at ¶ 15, 44 P.3d 781 (quoting *DCM Inv. Corp. v. Pinecrest Inv. Co.*, 2001 UT 91, ¶ 6, 34 P.3d 785).

## ANALYSIS

### I. DATE LEASE COMMENCED

■ ¶ 15 The first issue on appeal is whether the trial court erred in holding that the lease agreement executed by Voest–Alpine and Mountain States commenced on March 1, 1994. According to the lease agreement, Voest–Alpine was required to "obtain and keep in force during the *term of this lease* " an insurance policy that insured both Mountain States and Voest–Alpine against any liability arising out of the ownership, use, or occupancy of the leased premises, which the trial court concluded would have covered the injuries of Bakowski and Ramirez.[2] (Emphasis added.) If the lease term did not commence on or before March 4, 1994, the date of the man-basket incident that injured Bakowski and Ramirez, then Voest–Alpine would have no obligation to Mountain States for the settlement amounts paid to Bakowski and Ramirez because Voest–Alpine's contractual obligation to purchase liability insurance would not have been in effect on that date. Voest–Alpine contends that the lease term did not commence until Mountain States actually delivered possession of the premises. The parties do not dispute that Mountain States did not deliver

---

**2.** On appeal, neither party raises the status of Bakowski and Ramirez for purposes of the Work-

ers' Compensation Act, and we therefore do not address it in this opinion.

possession of the premises until April 6, 1994, after Bakowski and Ramirez were injured. Voest–Alpine further contends that it would be inequitable for the lease term to commence before Mountain States delivered possession to Voest–Alpine because Voest–Alpine would be required to insure land that it did not possess.

¶ 16 The date on which the lease term commenced is a matter of contract interpretation. When interpreting a contract, a court first looks to the contract's four corners to determine the parties' intentions, which are controlling. *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599; *see also Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991). If the language within the four corners of the contract is unambiguous, then a court does not resort to extrinsic evidence of the contract's meaning, and a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law. *Cent. Fla. Invs.*, 2002 UT 3 at ¶ 12, 40 P.3d 599; *Zions First Nat'l Bank v. Nat'l Am. Title Ins. Co.*, 749 P.2d 651, 653 (Utah 1988). Unless extrinsic evidence regarding the interpretation of a contract was received by the trial court, we review a trial court's plain language contract interpretation for correctness. *Gibbs M. Smith, Inc. v. United States Fid. & Guar. Co.*, 949 P.2d 337, 340 (Utah 1997); *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 90 (Utah 1988); *see also Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 6, 983 P.2d 575. Moreover, a court will look to extrinsic evidence only when the contract language is ambiguous. *Cent. Fla. Invs.*, 2002 UT 3 at ¶ 12, 40 P.3d 599; *Winegar*, 813 P.2d at 108. "A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Winegar*, 813 P.2d at 108 (quoting *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983)).

¶ 17 In the instant case, the contract language with respect to when the lease began is clear and unambiguous. Paragraph 2 of the lease agreement provides:

2.1. *Term.*

The term of this lease shall be for a period commencing on the 1st day of March, 1994, and terminating twelve (12) months thereafter, unless sooner terminated or extended pursuant to any provision hereof.

According to the plain language of paragraph 2.1, the lease term commenced on March 1, 1994, and was to terminate twelve months later unless extended by the lease agreement itself. In the event that the premises were not ready for Voest–Alpine's possession on March 1, 1994, another provision of the lease provides Voest–Alpine a remedy. Paragraph 2.3 states in pertinent part:

2.3. *Delay in Commencement.*

The parties acknowledge that time is of the essence of this lease, particularly with respect to completion of improvements and commencement of occupancy. [Mountain States] agrees to make the improvements ... set forth in Exhibit "C" and its attachments pursuant to the schedule for completion set forth therein .... If [Mountain States] fails to comply in any respect with the Completion Schedule, [Voest–Alpine] may, at its sole option, perform or cause to be performed any work or service and purchase or acquire any materials necessary to keep the [required improvements] on schedule.... *If for any reason, [Mountain States] cannot deliver possession of the premises to [Voest–Alpine] on March 1, 1994, [Voest–Alpine] shall not be obligated to pay rent ... until possession is delivered.* Possession cannot be delivered until the completion of item numbers 2, 3, 6, 8, 9, 10, 11, and 15 of Attachment 1 to Exhibit "C".

(Emphasis added.)

¶ 18 This paragraph does not extend or alter the commencement date of the lease. Rather, paragraph 2.3 suspends only Voest–Alpine's duty to pay rent until possession is delivered in the event of delay. While the caption to paragraph 2.3 reads "Delay in Commencement," the words are meaningless inasmuch as paragraph 15.5 unequivocally states that the "captions are not a part of this lease."

¶ 19 In fact, it is reasonable that the duty to procure insurance commenced on March 1, 1994: On that date, Voest–Alpine had the option to either complete the improvements itself or assist Mountain States in completing the improvements in the event that Mountain States did not finish the improvements by the lease commencement date. If the parties intended that delay of possession would delay the commencement date of the lease instead of delaying only the payment of rent, the parties could have clearly drafted the contract to manifest that intent. We will not make a better contract for the parties than they have made for themselves. *Rio Algom Corp. v. Jimco Ltd.,* 618 P.2d 497, 505 (Utah 1980). Nor will we avoid the contract's plain language to achieve an "equitable" result. *See Utah Coal & Lumber Rest., Inc. v. Outdoor Endeavors Unlimited,* 2001 UT 100, ¶ 12, 40 P.3d 581 (stating that "equitable relief should not be used to 'assist one in extricating himself from circumstances which he has created'" (quoting *Battistone v. Am. Land & Dev. Co.,* 607 P.2d 837, 839 (Utah 1980))).

¶ 20 Therefore, the trial court correctly concluded that the lease term commenced on March 1, 1994. Consequently, paragraph 6.1 of the lease required Voest–Alpine to procure insurance that would have insured Mountain States for claims arising out of the ownership, use, or occupancy of the leased premises.

## II. WAIVER OF SUBROGATION

¶ 21 The next issue on appeal is whether the trial court erred in granting Voest–Alpine summary judgment when it concluded that the waiver of subrogation clause of paragraph 6.4 of the lease agreement bars Mountain States "from bringing this action to recover the sums it" paid to Bakowski and Ramirez. Specifically, the trial court concluded that while Voest–Alpine was contractually obligated to obtain insurance that would have covered the injuries suffered by Bakowski and Ramirez, Mountain States waived the subrogation rights of its insurers by agreeing to paragraph 6.4 of the lease agreement. Paragraph 6.4 of the lease agreement provides:

*Waiver of Subrogation.* [Voest–Alpine] and [Mountain States] each waive any and all rights of recovery against the other, or against the officers, employees, agents and representatives of the other, for loss of or damage to such waiving party or its property or the property of others under its control where such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. [Voest–Alpine] and [Mountain States] shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this lease, and shall obtain endorsements to the respective policies recognizing the waiver.

The court further concluded that Mountain States waived its insurers' subrogation rights regardless of whether notice was ever given to those insurers because "[t]he notice provision of the waiver of subrogation clause does not create any conditions precedent to the applicability of the waiver of subrogation clause."

¶ 22 Subrogation is a doctrine conceived in equity that "'allows a person or entity [that] pays the loss or satisfies the claim of another under a legally cognizable obligation or interest to step into the shoes of the other person and assert that person's rights.'" *State Farm Mut. Auto. Ins. Co. v. Northwestern Nat'l Ins. Co.,* 912 P.2d 983, 985 (Utah 1996) (quoting *Educators Mut. Ins. Ass'n v. Allied Prop. & Cas. Ins. Co.,* 890 P.2d 1029, 1030 (Utah 1995)). In Utah, by statute an insurer can bring a subrogation action in the name of its insured. Utah Code Ann. § 31A–21–108 (2001). The insurer succeeds to the insured's cause of action against a responsible third party. *Id.; see also State Farm Mut. Auto. Ins.,* 912 P.2d at 985; *Educators Mut. Ins. Ass'n,* 890 P.2d at 1031. Although generally governed by equitable principles, the "doctrine can be modified by contract." *Hill v. State Farm Mut. Auto. Ins. Co.,* 765 P.2d 864, 866 (Utah 1988).

¶ 23 An insurer's subrogation right to recover from a responsible third party the amount the insurer paid to or on

behalf of its insured derives from the insurance contract between the insurer and the insured, not from any contract or relationship between the insurer and the third party. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. John Zink Co.*, 972 S.W.2d 839, 843–44 (Tex.App.1998); 44 Am.Jur.2d *Insurance* § 1795 (1982). In asserting any purported subrogation right against the third party, the insurer can be "subrogated to only such rights as the insured possesses," 44 Am. Jur.2d *Insurance* § 1795; *see also E.H. Ashley & Co. v. Wells Fargo Alarm Servs.*, 907 F.2d 1274, 1277 (1st Cir.1990); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 972 S.W.2d at 843–44, because the insurer, as subrogee, "steps into the shoes" of the insured, *State Farm Mut. Auto. Ins. Co.*, 912 P.2d at 985. Because the insurer can succeed only to those rights or causes of action that the insured possesses against the third party, the insurer is subject to any viable defenses the third party can assert against the insured, *Fashion Place Inv., Ltd. v. Salt Lake County*, 776 P.2d 941, 945 (Utah Ct.App.1989); 44 Am.Jur.2d *Insurance* § 1795, including a release from liability or a waiver of a cognizable cause of action, *Ind. Ins. Co. v. Erhlich*, 880 F.Supp. 513, 517 (W.D.Mich.1994); 44 Am.Jur.2d *Insurance* § 1810. Accordingly, an insured can generally waive an insurer's subrogation rights against a particular third party through a pre-loss agreement[3] with that third party in which the insured agrees to exculpate the third party from any liability for which the insurer may seek subrogation. *Ind. Ins. Co.*, 880 F.Supp. at 516–19; *Richmond Steel, Inc. v. Legal & Gen. Assurance Soc., Ltd.*, 821 F.Supp. 793, 799–802 (D.P.R. 1993); *Emery Waterhouse Co. v. Lea*, 467 A.2d 986, 994 (Me.1983); *Great N. Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 291 Minn. 97, 189 N.W.2d 404, 406–07 (1971); *Dolphine Mfg., Inc. v. Tehaar*, 404 N.W.2d 295, 297 (Minn.Ct.App.1987); *Cont'l Ins. Co. v. Boraie*, 288 N.J.Super. 347, 672 A.2d 274, 277–78 (Ct. Law Div.1995); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 972 S.W.2d at 843–44; *Interstate Fire Ins. Co. v. First Tape, Inc.*, 817 S.W.2d 142, 145 (Tex.App.1991); *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wash.2d 334, 831 P.2d 724, 728 (1992) (en banc); *Millican of Wash., Inc. v. Wienker Carpet Serv., Inc.*, 44 Wash. App. 409, 722 P.2d 861, 863–64 (1986); Lee R. Russ & Thomas F. Segalla, 16 *Couch on Insurance* 3d § 224:76 (2000) [hereinafter *Couch* ]; *see also Harlington Realty Corp. v. S.L.G. Discount Corp.*, 162 A.D.2d 176, 556 N.Y.S.2d 308, 309 (App.Div.1990) (denying waiver of subrogation because waiver was conditional and condition failed). As explained in *Couch:*

> Because an essential element of subrogation is that the insured have a viable claim against a third party, the insured's enforceable pre-loss release of any right to hold a particular third party responsible for damages in a given circumstance has the effect of preventing the insurer's subrogation rights from ever arising upon its payment of that loss to the insured. Accordingly, an insured may defeat an insurance company's rights of subrogation by entering into an agreement of release with the [third party] before or after the policy is issued, but prior to loss.

*Couch* § 224:76 (footnotes omitted).

¶ 24 The rule allows contracting parties to retain their autonomy in making and executing contracts, including agreements releasing each other from liability; it also allows insurers to protect themselves from such waivers of subrogation: Insurers can protect themselves by (1) inserting an exclusion into their policies that permits the insurer to deny coverage if an insured waives the insurer's subrogation rights, (2) raising premiums to offset outlays incurred from the loss of their subrogation rights, (3) investigating whether a potential insured has already waived any subrogation rights, (4) requiring insureds to warrant at the time a policy is issued that the insured has not, and will not, waive the insurers' subrogation rights, and (5) obtaining reinsurance to cover any waiver of subrogation rights.

---

**3.** This does not abrogate our previous holdings that a post-injury "settlement between an injured party and a tort-feasor who has knowledge of the subrogation rights of the injured party's insurer does not destroy the subrogation claim of the injured party's insurer." *Educators Mut. Ins. Ass'n v. Allied Prop. & Cas. Ins. Co.*, 890 P.2d 1029, 1031 (Utah 1995).

¶ 25 Inasmuch as an insured can waive the subrogation rights of its insurer in a pre-loss agreement, we now turn to whether Mountain States, as insured, waived the subrogation rights of its insurers in paragraph 6.4. To determine whether the trial court correctly concluded that Mountain States waived the subrogation rights of its insurers, we review the trial court's plain language contract interpretation for correctness. *Gibbs M. Smith, Inc. v. United States Fid. & Guar. Co.*, 949 P.2d 337, 340 (Utah 1997); *see also Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 6, 983 P.2d 575.

¶ 26 Paragraph 6.4 of the lease agreement provides:

> *Waiver of Subrogation.* [Voest–Alpine] and [Mountain States] each waive any and all rights of recovery against the other, or against the officers, employees, agents and representatives of the other, for loss of or damage to such waiving party or its property or the property of others under its control where such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. [Voest–Alpine] and [Mountain States] shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this lease, and shall obtain endorsements to the respective policies recognizing the waiver.

Mountain States contends that this paragraph does not waive the subrogation rights of its insurers because (1) the waiver of subrogation was conditional and the conditions precedent were not met, and (2) paragraph 6.4 applies only to insurance required by the lease.

¶ 27 First, Mountain States asserts that the first sentence of paragraph 6.4 does not independently effectuate a waiver of subrogation, but is inextricably connected to the second sentence, which "ensures" a waiver of subrogation. However, Mountain States continues, the second sentence conditions the applicability of the waiver on notice to the insurance carrier that the lease agreement waives subrogation and on the insurer's recognizing the waiver in endorsements to

the relevant insurance policies. It is undisputed that Mountain States' insurers did not endorse the waiver.

¶ 28 However, the first sentence of paragraph 6.4 independently effectuates a waiver of subrogation. That sentence unequivocally provides that Mountain States and Voest–Alpine mutually *"waive any and all rights of recovery against the other* ... *for loss of or damage to such waiving party* ... *where such loss or damage is insured against under any insurance policy in force at the time of such loss or damage."* (Emphasis added.) According to the plain language, Mountain States waived all causes of action against Voest–Alpine to recover for damages that were paid under *any* insurance policy. *See Richmond Steel, Inc.*, 821 F.Supp. at 800. Because a subrogee insurer can succeed only to the rights of its insured and because all defenses available to a third party against the insured can be used against the subrogee insurer, it necessarily follows that in this case Mountain States' insurers are also precluded from pursuing a subrogation action in Mountain States' name to recover for damages against Voest–Alpine that were paid by Mountain States' insurers. *See id.* It is therefore irrelevant that the first sentence does not mention that the waiver applies to insurers also.

¶ 29 As for the second sentence, it does not summarily invalidate the waiver if notice was not afforded to Mountain States' insurers or if the insurers did not endorse the waiver. Indeed, this sentence requires that notice be afforded to insurers and that those insurers recognize the waiver in endorsements to the respective policies, but paragraph 6.4 does not condition the validity of the waiver of subrogation upon the provision of notice or upon the procurement of the required endorsements. In other words, the waiver is independent of the lease's notice and endorsement requirements.

¶ 30 Second, Mountain States argues that the waiver of subrogation applies only to insurance required by the lease. However, according to its plain language, the first sentence of paragraph 6.4 applies to *any insurance,* regardless of whether that insurance is required by the lease. Mountain States ex-

plicitly waived all of its and its insurer's "rights of recovery" against Voest–Alpine if the damage or loss from which such rights derive is covered by *"any insurance policy* in force at the time of such loss or damage." (Emphasis added.) The term "any insurance policy" is expressly and intrinsically unlimited and therefore necessarily includes the policies that paid Bakowski and Ramirez on behalf of Mountain States.

¶ 31 Moreover, Mountain States' insurance is arguably "required by the lease." Mountain States had the option to purchase insurance at Voest–Alpine's expense if Voest–Alpine failed to procure the required insurance. Because Mountain States used its insurance to pay for the injuries as a substitute for insurance that it asserts Voest–Alpine was required to purchase under paragraph 6.1, it appears that Mountain States exercised the option irrespective of whether the insurance was purchased before or after March 1, 1994, when the lease commenced. Therefore, because an insurance policy covered these injuries, Mountain States waived its and its insurers' rights to recover against Voest–Alpine.

¶ 32 In sum, paragraph 6.4 validly waived the subrogation rights of Mountain States' insurers. Thus, the trial court correctly granted summary judgment to Voest–Alpine on the subrogation claim.

### III. ATTORNEY FEES

 ¶ 33 The final issue on appeal is whether the trial court abused its discretion in awarding Voest–Alpine $30,206.45 in attorney fees instead of $38,380. The trial court has broad discretion in determining what constitutes a reasonable attorney fee once it has been determined that a party is legally entitled to a fee award, and we will not reverse a trial court's determination of whether a fee is reasonable absent an abuse of discretion. *R.T. Nielson Co. v. Cook,* 2002 UT 11, ¶ 20, 40 P.3d 1119. In addition, we review a trial court's calculation of reasonable attorney fees for an abuse of discretion. *Dixie State Bank v. Bracken,* 764 P.2d 985, 988 (Utah 1988).

 ¶ 34 In Utah, "attorney fees are generally not recoverable 'unless authorized by statute or contract.'" *Miller v. USAA Cas. Ins. Co.,* 2002 UT 6, ¶ 69, 44 P.3d 663 (quoting *Faust v. KAI Techs., Inc.,* 2000 UT 82, ¶ 17, 15 P.3d 1266); *see also Ault v. Holden,* 2002 UT 33, ¶ 47, 44 P.3d 781. In this case, paragraph 15.13 of the lease agreement provides, "If either party brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party shall be entitled to its reasonable attorney fees."

¶ 35 In this case, after the trial court granted Voest–Alpine's motion for summary judgment, Voest–Alpine moved for attorney fees in the amount of $30,206.45 for its Salt Lake counsel and $23,637.50 for its Pittsburgh counsel. In a signed memorandum decision dated September 11, 2000, the trial court awarded attorney fees for Voest–Alpine's Salt Lake counsel only and explained:

> This Court has carefully reviewed both affidavits submitted for attorney fees. [Voest–Alpine's] claim [to attorney fees for its Salt Lake counsel is based upon] a reasonable expenditure of time ... on a case of this complexity. The hourly rates assessed are well within the fees normally charged in this area for this type of litigation. The total bill [charged by Voest–Alpine's Salt Lake counsel] of $30,206.45[ ] represents a reasonable fee incurred in the defense of the third[-]party action maintained by [Mountain States]....

In connection therewith, the trial court ordered Voest–Alpine's counsel to prepare "appropriate findings and a judgment." While preparing the judgment as directed, Voest–Alpine's counsel discovered that Voest–Alpine's original motion for attorney fees "inadvertently" omitted $8,173.55 due to an alleged arithmetic error and a change in billing systems. To correct the error, Voest–Alpine submitted to the trial court proposed findings of fact and conclusions of law stating that Voest–Alpine actually incurred a total of $38,380 in attorney fees defending this litigation, which were supported by affidavits, and Voest–Alpine submitted a proposed judgment awarding Voest–Alpine attorney fees in that amount. Before signing the proposed documents, the trial court corrected both

documents, awarding Voest–Alpine only $30,206.45 in conformity with the trial court's original reasonableness determination.

¶ 36 On appeal, Voest–Alpine contends that the trial court abused its discretion by failing to award Voest–Alpine the augmented attorney fee of $38,380 when this increased award was supported by affidavits in the record, this amount constituted a reasonable fee, and the trial court failed to explain why it refused to award the additional $8,173.55.

¶ 37 The trial court did not abuse its discretion in awarding only $30,206.45. Before Voest–Alpine submitted the proposed judgment awarding Voest–Alpine the increased amount, the trial court determined, with explanation, that $30,206.45 was reasonable and ordered Voest–Alpine's counsel to prepare a judgment awarding Voest–Alpine attorney fees in conformity with that ruling. *See* Utah R. Jud. Admin. 4–504(1) (providing that party must "file with the court a proposed order, judgment, or decree *in conformity* with the ruling." (emphasis added)). By unilaterally submitting a proposed award that increased the award from the trial court's ruling, Voest–Alpine attempted to obtain an unauthorized attorney fee award in an amount that the trial court never determined was reasonable. *See id.* Such attempt to increase a fee award is at best unorthodox, at worst furtive. The unilateral alteration verges on an attempt to circumvent the trial court's orders and determinations. The trial court did not abuse its discretion by correcting the proposed findings of fact and conclusions of law and the proposed judgment to conform to the court's original award of $30,206.45, thereby maintaining its own discretion, control, and authority over attorney fee awards.

██ ¶ 38 Moreover, a trial court is not required to adopt the prevailing party's assertion of what constitutes a reasonable attorney fee, even if the fee sought is supported by an affidavit. In *Dixie State Bank,* we explained that a "trial court is allowed to reduce the amount asserted by one party in determining a reasonable fee" and that the trial court is not required to accept self-interested evidence regarding the reasonableness of an asserted fee. 764 P.2d at 989.

¶ 39 Further, the party moving for attorney fees in reliance on its own imprecise and erroneous calculations must carry the burden of following the proper procedural course of filing an amended motion for attorney fees to redress its mistake or be responsible for and suffer the consequences of the error. In this case, Voest–Alpine inappropriately assumed that the trial court would tacitly acquiesce in the proposed augmented attorney fees award without first ruling on the reasonableness of the increased award simply because the proposed findings of fact and conclusions of law and the proposed judgment were accompanied by an affidavit supporting the award. Instead, Voest–Alpine should have filed an amended motion for attorney fees or a motion to augment the attorney fee award, let the trial court decide whether $38,380 was a reasonable fee, and then—should the trial court increase the award—prepare a proposed judgment in conformity with the court's revised decision. *See, e.g., ProMax Dev. Corp. v. Raile,* 2000 UT 4, ¶ 16, 998 P.2d 254; *see also N.A.R., Inc. v. Walker,* 2001 UT 98, ¶¶ 2–7, 37 P.3d 1068; Utah R. Civ. P. 7(b)(1); Utah R. Jud. Admin. 4–504(1). Therefore, the trial court did not abuse its discretion in refusing to award Voest–Alpine an additional $8,173.55 in attorney fees.

## CONCLUSION

¶ 40 The trial court correctly concluded that the lease term commenced on March 1, 1994, and that the waiver of subrogation in the lease precluded Mountain States' claims. Additionally, the trial court did not abuse its discretion by refusing to award Voest–Alpine additional attorney fees. We therefore affirm.

¶ 41 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice HOWE, and Justice WILKINS concur in Justice RUSSON's opinion.