2003 UT App 98

**FAIRBOURN COMMERCIAL, INC.,
a Utah corporation, Plaintiff
and Appellee,**

v.

**AMERICAN HOUSING PARTNERS,
INC., a Delaware corporation,
Defendant and Appellant.**

**No. 20020060–CA.**

Court of Appeals of Utah.

April 3, 2003.

Dennis K. Poole and John L. Adams, Salt Lake City, for Appellant.

Neil R. Sabin, Salt Lake City, for Appellee.

Before JACKSON, P.J., and GREENWOOD, and ORME. JJ.

## OPINION

JACKSON, Presiding Judge:

¶ 1  American Housing Partners, Inc. (American) appeals from a judgment awarding Fairbourn Commercial, Inc. (Fairbourn) a real estate commission of $153,000 plus attorney fees and costs in the amount of $45,001.  We affirm.

## BACKGROUND

¶ 2  In September 1998, American, an experienced real estate developer, entered into a contract to purchase real property in West Jordan, Utah (the property) from a group of sellers (the Coon Group). Armando Alvarez (Alvarez), a licensed real estate broker, handled all the transactions for American, which is owned by Alvarez's brother.

¶ 3  In early 1999, Alvarez approached Jim Fairbourn (Jim) of Fairbourn, a real estate brokerage, seeking assistance in selling the property.  At the time Alvarez began his conversations with Jim, American had been unable to gain the approvals from the City of West Jordan necessary to develop the property.  Because of the delay in city approval, the Coon Group and American signed an Addendum to the sales contract extending the closing date until April 5, 1999.  In April 1999, the city denied the zoning application.

¶ 4  In June or July 1999, Alvarez solicited Jim to help him find a buyer for the entire property due to his frustrations with the city.  In late July 1999, the Coon Group threatened to terminate its agreement to sell the property because American had failed to close.  In late August 1999, the Coon Group agreed to reinstate their contract of sale with American through December 1, 1999.  In the meantime, the city approved the necessary zoning for the property contingent on American acquiring an adjacent parcel of property owned by an opponent of American's proposed development.

¶ 5  In August 1999, Marshall Larson (Larson), an agent for Fairbourn, obtained an interested buyer for the property.  The buyer, Rochelle Properties, L.C. (Rochelle), was an affiliate under common control with Liberty Homes, Inc., a large Utah homebuilder.  On August 6, 1999, David C. Clark (Clark),

manager of Rochelle, signed a letter of intent to purchase the property for $23,000 per lot.

¶ 6 Fairbourn represented American in the transaction and Larson represented Rochelle under a "dual agency" agreement. After receipt of the letter of intent, a meeting occurred in American's office. Those present were Alvarez, Jim, Larson, Clark, and Irv Gardner (Gardner) of Rochelle. The meeting included a discussion of American's expectations regarding Rochelle's ability to perform.

¶ 7 On August 13, 1999, Rochelle made an offer to buy the property. The offer was presented to American on a preprinted Real Estate Purchase Contract with a handwritten addendum. The offer was accompanied by a Single Party Listing and Sale Agreement (Listing Agreement), identifying Rochelle as the prospective buyer. The Listing Agreement provided for payment to Fairbourn of a $1,500 per lot commission based on the sale of the 99 lots at a price of $2,277,000. Alvarez signed the Listing Agreement but rejected the offer.

¶ 8 Rochelle presented a second offer several days later. American submitted a written counteroffer (the Purchase Contract) that incorporated the terms of the second offer and added several new provisions. Among the new provisions was a term entitled "Financial Capability," which provided:

> Within Fourteen days after execution of this Agreement by both parties, Buyer shall supply ... Seller with evidence of financial capability to close on the Property within the time frame referenced above. In the event Buyer is unable to provide said evidence, Seller shall at its sole option cancel this Agreement and neither party shall have any further obligation to the other.

¶ 9 On August 30, 1999, Alvarez, Jim, Larson, and Clark met and reviewed the Purchase Contract, including the "Financial Capability" clause, which required evidence within fourteen days of signing. After initialing a change regarding the closing of the Purchase Contract, the seller and buyer signed.

¶ 10 Pursuant to the Financial Capability clause, Rochelle arranged for a letter from Cy Simon (Simon), a construction loan officer of First Security Bank, to be delivered to American. Alvarez rejected the letter as satisfying the requirement of "evidence of financial capability." Rochelle then arranged for a second letter, dated September 17, 2000, to be sent from the Bank providing more detail as to the availability of credit lines and amounts of current loans in place.

¶ 11 Alvarez also rejected the second letter, and on September 21, 1999, he telephoned Fairbourn to inform it that he was rejecting the letters and terminating the Purchase Contract. The sole reason Alvarez gave for rejecting the letters was that they did not comply with the Financial Capability provision of the Purchase Contract. Rochelle then recovered its earnest money deposit, and Alvarez sold the property to another purchaser.

¶ 12 Fairbourn filed suit in the Third District Court against American to recover its sales commission pursuant to the Listing Agreement. On December 18, 2001, the trial court entered judgment against American for the sum of $153,000 plus attorney fees and costs. American now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 13 American challenges the trial court's determination that Fairbourn was entitled to a commission under the terms of the Listing Agreement. Specifically, American challenges the trial court's interpretation of the Listing Agreement's language that Fairbourn's commission was due at the closing of the Rochelle sale.

> A contract's interpretation may be either a question of law, determined by the words of the agreement, or a question of fact, determined by extrinsic evidence of intent. If a contract is not integrated or is ambiguous and the trial court finds facts regarding the parties' intent based on extrinsic evidence, we will not disturb the findings unless they are clearly erroneous. However, [q]uestions of contract interpretation not requiring resort to extrinsic evidence are matters of law, and on such questions

we accord the trial court's interpretation no presumption of correctness.

*Schmidt v. Downs,* 775 P.2d 427, 430 (Utah Ct.App.1989) (alteration in original) (quotations and citations omitted).

¶ 14 American also challenges the trial court's initial determination that the terms of the Purchase Contract are ambiguous, the court's taking of extrinsic evidence, and its factual findings based on the evidence admitted.[1] Fairbourn defends each link in the trial court's approach. It is unnecessary for us to consider each of these arguments, however, because there are proper grounds to affirm. *See Buehner Block Co. v. UWC Assocs.,* 752 P.2d 892, 895 (Utah 1988) ("[W]e may affirm trial court decisions on any proper ground(s), despite the trial court's having assigned another reason for its ruling."). Specifically, the meaning of the Purchase Contract is not the dispositive issue in this appeal. Rather, the dispositive issue is whether Fairbourn is entitled to a commission under the terms of the Listing Agreement. Thus, American's arguments based on the Purchase Contract fail to distinguish its separate contractual obligations to Fairbourn under the Listing Agreement. *See Robert Langston, Ltd. v. McQuarrie,* 741 P.2d 554, 558 (Utah Ct.App.1987) (reversing trial court's denial of commission to real estate broker where trial court confused seller's obligation to buyer with its separate obligation to broker). Because the terms of the Listing Agreement are dispositive of American's obligations to pay Fairbourn a commission, we need not analyze the ambiguities of American's Purchase Contract with Rochelle.[2]

---

1. American also argues the trial court improperly applied Utah law regarding who is a "ready, willing, and able buyer," phraseology often employed in listing agreements. The Listing Agreement in this case, however, does not contain this language. Thus, we cannot read it into the agreement. *See Bakowski v. Mountain States Steel, Inc.,* 2002 UT 62,¶ 19, 52 P.3d 1179 ("We will not make a better contract for the parties than they have made for themselves. Nor will we avoid the contract's plain language to achieve an 'equitable' result."); *Utah Farm Bur. Ins. Co. v. Crook,* 1999 UT 47,¶ 6, 980 P.2d 685 (stating courts "may not rewrite [a] contract ... if the language is clear") (internal quotations and citations omitted) (omission in original).

## ANALYSIS

¶ 15 A listing agreement is a contract between a real estate broker and a seller. *See generally Golden Key Realty, Inc. v. Mantas,* 699 P.2d 730 (Utah 1985).

> When interpreting a contract, a court first looks to the contract's four corners to determine the parties' intentions, which are controlling. If the language within the four corners of the contract is unambiguous, then a court does not resort to extrinsic evidence of the contract's meaning, and a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law.

*Bakowski v. Mountain States Steel, Inc.,* 2002 UT 62,¶ 16, 52 P.3d 1179.

¶ 16 In this case, the Listing Agreement's language regarding Fairbourn's commission is clear and unambiguous. It provides:

> IF, AT ANY TIME, WITHIN SAID PERIOD, FAIRBOURN COMMERCIAL INC. procures, or presents an offer to purchase said property from [Rochelle], at the price and upon the terms and conditions set forth herein, or at any other price or upon any other terms or conditions acceptable to me, I agree to pay a commission equal to $1,500.00 per lot.

According to this plain language, American agreed to pay Fairbourn a commission if it procured or presented an offer from Rochelle to purchase under the price, terms, and conditions in the Listing Agreement. The price stipulated in the Listing Agreement was $2,277,000 and the terms were "Cash at Closing."

---

2. American also contends the trial court erred in not holding Fairbourn to the standard of a fiduciary with relation to American. American asserts it raised this issue in closing arguments, which were not recorded. However, the trial court did not mention the argument in its memorandum decision. We cannot rely on American's assertion that is unsupported by the record on appeal, and therefore, we cannot consider this issue on appeal. *See State v. Marquez,* 2002 UT App 127,¶ 7, 54 P.3d 637 (refusing to address an argument not preserved in the trial court).

¶ 17 On August 30, 1999, American and Rochelle entered into a Purchase Contract. Under the terms of the Purchase Contract, Rochelle agreed to pay American $2,277,000 cash at closing for the property. Thus, Fairbourn procured or presented an offer from Rochelle that satisfied the requirements of the Listing Agreement and was accepted by American. Accordingly, Fairbourn performed its contractual duties under the Listing Agreement and is entitled to its commission from American.

¶ 18 American contends Fairbourn is not entitled to a commission because the Listing Agreement conditioned the receipt of commission on completion of the sale of the property to Rochelle. The general rule in Utah is that "[a]bsent a contractual provision which conditions the right to a commission on the performance or part performance of the buyer, the broker is not an insurer of the subsequent performance of the contract and is not deprived of his right to a commission by the failure or refusal" of one party to perform. *Robert Langston, Ltd. v. McQuarrie*, 741 P.2d 554, 557–58 (Utah Ct.App.1987). The Listing Agreement provides:

> ALL COMMISSIONS shall be due and payable at closing. . . .

¶ 19 If a broker's listing agreement imposes unconditional liability for broker's fees or is silent on the matter, a court will not imply a condition making such fees contingent on either the buyer's or seller's performance of the purchase contract. *See Bushnell Real Estate, Inc. v. Nielson,* 672 P.2d 746, 751 (Utah 1983) (refusing to adopt minority rule, which conditions broker's commission on buyer's performance if contract

does not expressly condition liability for commission); *Robert Langston Ltd.,* 741 P.2d at 558 n. 7 (refusing to condition broker's commission on parties' performance where contract did not contain conditional language).

¶ 20 Thus, we must determine whether the phrase "due and payable at closing" creates a condition precedent to Fairbourn's entitlement to commission or whether it merely establishes the time for the commission to be paid. In Utah, absent a contractual provision to the contrary, a real estate broker, whose commission is due at closing, is entitled to full commission at closing regardless of the buyer's subsequent performance. *See Bushnell Real Estate, Inc.,* 672 P.2d at 748–51 (affirming trial court's award of commission to broker because listing agreement, which provided commission was due at closing, did not condition broker's receipt of commission on buyer's performance).

¶ 21 However, *Bushnell Real Estate, Inc.* and *Robert Langston Ltd.* do not address the precise question of whether a real estate broker, whose commission is due and payable at closing, is entitled to commission when a closing does not occur. This is a matter of first impression in Utah. The majority rule,[3] which we now adopt, is that the phrase "at closing," by itself, is not a condition precedent to a broker's receipt of commission.

¶ 22 The majority rule accords with the presumption in *Bushnell Real Estate, Inc.* that a broker is entitled to commission and is not an insurer of the buyer's performance.

---

3. *See, e.g., Finno Dev., Inc. v. Smedes Realty,* No. CV010163687S, 2001 WL 420584, at *1, 2001 Conn.Super. LEXIS 995, at *3 (April 11, 2001) (holding that contract providing commission was to be paid within 72 hours of closing did not condition the payment of commission on the closing); *Don J. McMurray Co. v. Wiesman,* 199 Neb. 494, 260 N.W.2d 196, 200–01 (1977) (contract providing commission was "due and payable . . . at the time of loan closing," did not condition the broker's commission on the actual loan closing); *Samuel R. Laden, Inc. v. Lidgerwood Estates, Inc.,* 15 N.J. Misc. 498, 192 A. 425, 428 (1937) ("In order to absolve a party from the payment of commissions, it must clearly appear by the contract with his broker that the payment

of commissions was made contingent upon the actual transfer of title.") (Internal quotations and citation omitted.). *But see Arvida Realty Sales, Inc. v. William R. Tinnerman & Co.,* 536 So.2d 1041, 1042 (Fla.Dist.Ct.App.1988) (holding brokers were not entitled to commission where agreement provided commission was payable at closing of real estate transaction because brokers did not produce clients that closed); *Doss v. Moses & Sloan P'ship,* C.A. No. L–88–212, 1989 WL 25537, at *2, 1989 Ohio App. LEXIS 845, at *5 (March 17, 1989) (determining broker's right to payment was subject to an express condition where owner promised to pay commission on closing of the deal).

*See Bushnell Real Estate, Inc.,* 672 P.2d at 748–51. Moreover, American and Fairbourn could have included in the Listing Agreement words widely recognized as conditional, such as: only, unless, until, or if.[4] The fact that they chose not to include such conditional language indicates they did not intend Fairbourn's commission to be conditioned on the closing of the deal. Accordingly, we hold Fairbourn is entitled to a commission.

## CONCLUSION

¶ 23 Fairbourn is entitled to a commission because it procured an offer from Rochelle to purchase the property according to the terms and conditions of the Listing Agreement. The phrase "at closing" did not condition Fairbourn's receipt of a commission on the actual closing, it merely indicated when the commission was due. Affirmed.

¶ 24 WE CONCUR: PAMELA T. GREENWOOD, Judge, and GREGORY K. ORME, Judge.

---

4. These words have been recognized by other jurisdictions as making a broker's commission conditional. *See Harbour Inn, Inc. v. Kagan,* 343 So.2d 1353, 1355 (Fla.Dist.Ct.App.1977) (denying brokerage fees where commission was to "only be paid upon . . . the actual consummation of the loan"); *Kay v. Sperling,* 83 So.2d 881, 882 (Fla.1955) (denying brokerage fees where commission was not to be paid " 'unless and until a deal [was] consummated' ") (citation omitted); *William A. White & Sons v. La Touraine–Bickford's Foods, Inc.,* 50 A.D.2d 547, 375 N.Y.S.2d 351, 352 (N.Y.App.Div.1975) (denying brokerage fees where agreement provided " 'if a sale is consummated by yourself a commission . . . will be paid' ") (citation omitted).