2008 UT App 104

**Cindy L. YOUNG, Plaintiff and Appellant,**

v.

**WARDLEY CORPORATION, a Utah corporation dba Wardley Better Homes & Gardens, Defendant and Appellee.**

No. 20060796–CA.

Court of Appeals of Utah.

March 27, 2008.

Rehearing Denied April 28, 2008.

Delano S. Findlay, Murray, for Appellant.

John T. Anderson, Salt Lake City, for Appellee.

Before Judges BILLINGS, DAVIS, and McHUGH.

## OPINION

BILLINGS, Judge:

¶ 1 Plaintiff Cindy L. Young appeals the trial court's orders granting both of Defendant Wardley Corporation's (Wardley) motions for partial summary judgment and dismissing Young's claims for breach of contract and breach of the covenant of good faith and fair dealing. We affirm.

## BACKGROUND

¶ 2 On April 30, 1992, Young and Wardley entered into a Broker–Sales Executive Contract/Independent Contractor Agreement (the Agency Agreement) wherein Young contracted to act as a real estate agent for Wardley. While an agent with Wardley, Young secured a buyer for the Chateau Brickyard Retirement Apartments (the Chateau Apartments) in Salt Lake City, Utah, for a purchase price of $7,900,000. The seller of the Chateau Apartments agreed to pay a four-percent commission on the sales price, which totaled $316,000.

¶ 3 On July 1, 1996, the buyer closed the purchase of the Chateau Apartments at a sales price of $7,900,000. Young and the buyer were present at the office of the escrow closing agent, Associated Title Compa-

ny. The seller was present on the telephone. Because the closing documents had to be delivered to the out-of-state seller for signatures, the closing was not finalized until several days later.

¶4 At the closing of the sale, the seller and the buyer mutually decided to reduce the commission to $150,000. Young, on behalf of Wardley, objected to the commission reduction, but did not take any other action to prevent the escrow agent from paying one-half of the unpaid commission to the seller and one-half to the buyer.

¶5 After the sale closed, Wardley brought suit against the seller for breach of contract and obtained a default judgment. However, after registering the judgment in the seller's home state and conducting an asset search, Wardley learned that the seller was financially insolvent and judgment proof. Wardley did not make any further efforts to collect the judgment.

¶6 Young received her share of the $150,000 commission Wardley collected at the closing of the Chateau Apartments.[1] However, Wardley did not pay Young her share of the $166,000 uncollected portion of the commission. Young brought suit against Wardley in December 1999, seeking her share of the $166,000 unpaid commission. In March 2004, the trial court granted Wardley's first motion for partial summary judgment and dismissed Young's claim for breach of the implied covenant of good faith and fair dealing. In November 2006, the trial court granted Wardley's second motion for partial summary judgment and dismissed Young's claim for breach of contract. Young now appeals.

## ISSUE AND STANDARD OF REVIEW

¶7 Young argues that the trial court erred in granting both of Wardley's motions for partial summary judgment and dismissing Young's claims for breach of contract and breach of the covenant of good faith and fair dealing. "In reviewing the [trial] court's grant of summary judgment, we review the court's legal decisions for correctness, giving no deference, and review the facts and inferences therefrom in the light most favorable to the nonmoving party." *Brockbank v. Brockbank*, 2001 UT App 251, ¶10, 32 P.3d 990 (internal quotation marks omitted).

## ANALYSIS

### I. Breach of Contract Claim

¶8 Young first asserts that the trial court erred when it dismissed Young's claim for breach of contract. In doing so, the trial court ruled that the Agency Agreement unambiguously limits Young's share of the commission to funds that Wardley actually collects. Young claims that the language in the Agency Agreement does not limit Wardley's obligation to pay Young her share of the commission only to the extent it actually collects the commission, but that it instead requires Wardley to pay Young her share of the $316,000 total commission from the sale of the Chateau Apartments, even though Wardley only collected $150,000. We disagree.[2]

¶9 In Utah, a court may grant summary judgment enforcing a contract when the contract terms are "complete, clear, and unambiguous." *Aspenwood, LLC v. C.A.T., LLC*, 2003 UT App 28, ¶30, 73 P.3d 947 (internal quotation marks omitted). "If the language within the four corners of the contract is unambiguous, then a court does not resort to extrinsic evidence of the contract's meaning, and a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law." *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶16, 52 P.3d 1179.

---

1. During the course of the proceedings on summary judgment, Young amended her complaint and raised claims that Wardley failed to pay her all of her share of the commission to which she was entitled from the $150,000 that Wardley actually received. She received a jury verdict and judgment in her favor on that claim.

2. Young also claims that there are disputed issues of material fact that preclude summary judgment on her breach of contract claim. However, Young never articulates what facts are disputed and relevant to interpreting the language and plain meaning of the contract. Therefore, we do not address this argument.

¶ 10 In analyzing the language in the Agency Agreement, "[i]t is [the trial] court's duty to enforce the intentions of the parties as expressed in the plain language of the [contract's] covenants." *Holladay Duplex Mgmt. Co. v. Howells,* 2002 UT App 125, ¶ 2, 47 P.3d 104. The trial court is to consider "[e]ach contract provision ... in relation to all of the others, with a view to giving effect to all and ignoring none." *Plateau Mining Co. v. Utah Div. of State Lands & Forestry,* 802 P.2d 720, 725 (Utah 1990). The trial court in this case applied these principles when it determined that the language in the Agency Agreement unambiguously states that Young's right to receive commissions extends only to her portion of the amounts that Wardley actually collects from the underlying sales transaction.

¶ 11 The trial court's interpretation of the Agency Agreement is supported by at least four provisions of the Agency Agreement. Paragraph 8 of the Agency Agreement addresses Wardley's payment of commissions to Young. It states that "[d]ivision and distribution of earned commissions shall take place as soon as practical after *collection* of such commissions from the party or parties for whom the services have been performed." (Emphasis added.) A similar provision is reiterated in the "IN–HOUSE COMMIS-SION" provision on page 4 of the Agency Agreement: "[Young] receive[s] the percentage shown of the total commission *received by* [Wardley]." (Emphasis added.) Paragraph 9 deals with the situation where two or more real estate agents who are working with Wardley have overlapping or conflicting claims to a commission. The language in this paragraph also indicates that Wardley is only required to pay Young her share of the commissions that it actually collects: "[W]hen the commission shall have been collected from the party or parties for whom the service was performed, [Wardley] shall hold the same in trust, to be divided according to the terms of [the Agency Agreement]." Finally, paragraph 16 of the Agency Agreement addresses Wardley's payment of commission to Young in the event that either party terminates the Agency Agreement. Paragraph 16 states that Young would be entitled to a commission if Wardley "ha[s] been paid ... prior to the date of termination."

¶ 12 These provisions, both individually and collectively, indicate that unless Wardley actually collects the commission amount from the seller, it has no obligation to pay Young her share of the commission. In "consider[ing] [each contract provision] ... in relation to all of the others, with a view toward giving effect to all and ignoring none," *Plateau Mining,* 802 P.2d at 725, we conclude that the trial court correctly interpreted and enforced the Agency Agreement provisions that make Wardley's obligation to pay Young commissions contingent on its actual receipt of those commissions from the underlying sales transaction.[3]

¶ 13 Young cites to three Utah cases to support her position—*Fairbourn Commercial, Inc. v. American Housing Partners, Inc.,* 2004 UT 54, 94 P.3d 292; *Bushnell Real Estate v. Nielson,* 672 P.2d 746 (Utah 1983); and *Robert Langston, Ltd. v. McQuarrie,* 741 P.2d 554 (Utah Ct.App.1987)—but these cases involve commission disputes between the selling broker and the seller, not between the selling broker and the agent. The cases do not focus on contractual language, but rather simply support the general common law rule that "a real estate broker is entitled to its commission when it has procured a buyer who is 'ready, willing[,] and able and who is accepted by the seller.' " *Fairbourn,* 2004 UT 54, ¶ 7, 94 P.3d 292 (quoting *Bushnell,* 672 P.2d at 751). We do not find them helpful in interpreting the plain language of the Agency Agreement. Thus, we conclude that the Agency Agreement unambiguously provides that Wardley is obligated to pay

---

3. We note that Young relies heavily on a factually-similar Michigan case, *Abraham v. Walter Neller Co.,* 19 Mich.App. 488, 172 N.W.2d 817 (1969), in which the Michigan appellate court held that a real estate agent is entitled to his full commission, even if the broker never actually received the commission. However, we find *Abraham* unpersuasive for several reasons. First, *Abraham* is not controlling in Utah; second, it cites no legal authority for its conclusion; third, it was decided nearly forty years ago; and fourth, the contract language at issue in *Abraham* is distinguishable from the contract language in this case.

Young her share of the commissions only if Wardley actually receives those commissions.

## II. Breach of the Covenant of Good Faith and Fair Dealing Claim

¶ 14 Next, Young argues that the trial court erred in granting partial summary judgment and dismissing her breach of the covenant of good faith and fair dealing claim. The trial court ruled that Wardley did not breach the covenant of good faith and fair dealing because (1) the Agency Agreement's plain terms endowed Wardley with sole ownership of the listing and with exclusive discretion to decide whether and to what extent to pursue collection of any claimed commission, (2) Wardley undertook extensive efforts to collect the disputed commission from the seller, and (3) Young offered no evidence that the collection efforts did not comply with industry or other applicable standards. On appeal, Young focuses on two separate actions by Wardley that she claims breach the covenant of good faith and fair dealing. First, she claims that Wardley did nothing to prevent the parties and the escrow agent from reducing the commission at the time of closing, and second, she argues that Wardley did not pursue its claims against the title company and the buyer.

¶ 15 According to the Agency Agreement, "[d]ivision and distribution of earned commissions shall take place as soon as practical after collection of such commissions from the party or parties for whom the services have been performed." Regarding any disputes with third parties over commissions, the Agency Agreement provides that

> [Wardley] is the sole owner of all listings, rights and claims arising or in connection with the real property transactions which are the subject hereof and documentation relating thereto.... In the event of a dispute with a third party concerning payment of any commission, [Wardley] shall have the sole right to negotiate any settlement or to take, or defend any legal actions; and all such actions shall be maintained only in the name of [Wardley]. All costs and attorney fees of any kind incurred in such disputes shall be paid by

the parties hereto in the same proportions as they were entitled to the commissions.

¶ 16 Even though the Agency Agreement clearly states that Wardley has the sole right to "negotiate any settlement or to take, or defend any legal actions," our case law is clear that Wardley's actions still must comport with the implied covenant of good faith and fair dealing.

¶ 17 "The implied covenant of good faith and fair dealing (the covenant) inheres in every contract." *Markham v. Bradley,* 2007 UT App 379, ¶ 18, 173 P.3d 865. " 'Under [the covenant], both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract.' " *Id.* (alteration in original) (quoting *Eggett v. Wasatch Energy Corp.,* 2004 UT 28, ¶ 14, 94 P.3d 193).

¶ 18 First, we address Young's claim that Wardley breached the covenant by failing to prevent the closing from going forward once it became clear that the commission was going to be reduced. Young's and Wardley's affidavits before the trial court establish the following undisputed facts as to the events surrounding the closing. On June 28, 1996, the seller sent a facsimile transmission to Wardley, stating that he would not authorize the commission to Wardley as provided in the listing contract, but would instead authorize a $150,000 commission. The seller also attached a revised settlement statement showing the commission amount of $150,000. When the closing was completed, the $150,000 commission was disbursed to Wardley in accordance with the revised settlement statement.

¶ 19 Young claims that she only became aware of the parties' intentions to reduce the commission at the time of the closing on July 1, 1996. Young objected to the reduction and asked the escrow officer not to record the transaction until after Wardley received its full four-percent commission. There were no alleged facts in either affidavit that there were any communications among Young, Wardley, and the seller prior to the final closing and commission disbursement to Wardley. Young also does not allege that

she notified Wardley of the seller's intention to reduce the commission or that she requested that Wardley stop the closing. Instead, the seller instructed the title company and the buyer to close the transaction without full payment of Wardley's commission. Furthermore, the revised settlement statement with the revised commission to Wardley was an escrow agreement exclusively among the title company, the seller, the buyer, and the lender. Wardley was not a party to the revised settlement statement and was in no position to stop the sale, even if it had been informed of the change before the closing of the transaction was completed. Based upon these facts, we cannot say that Wardley breached the covenant by failing to prevent the parties from adhering to the revised settlement statement.

■ ¶ 20 Second, we address Young's claim that Wardley failed to effectively pursue its legal options against the seller, the buyer, and the title company to recover the unpaid commission. Regarding its actions toward the seller, it is clear from the record that Wardley brought legal action against the seller and obtained a default judgment. Wardley then registered the default judgment in the seller's home state and conducted an asset search. After learning about the seller's insolvency, Wardley did not make any further attempts to collect the commission from the seller. Regarding its actions toward the buyer and title company, Wardley concluded that it would not pursue legal action, in part, because neither the buyer nor the title company had entered into a contract with Wardley for the closing or the escrow on the property. After reviewing the record, we conclude that Young did not offer evidence that Wardley's collection efforts were unreasonable. Therefore, we conclude that the trial court did not err in dismissing Young's claim for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

¶ 21 Based on the foregoing, we agree with the trial court that the Agency Agreement unambiguously provides that Young is only entitled to her share of the commission that Wardley actually collects. We further con-

clude that Wardley's actions, both before and after the closing on the property, did not breach the implied covenant of good faith and fair dealing. Accordingly, we affirm.

¶ 22 WE CONCUR: JAMES Z. DAVIS and CAROLYN B. McHUGH, Judges.